[739 NYS2d 71]

Bates Advertising USA, Inc., Appellant, v 498 Seventh, LLC, Respondent.

First Department, March 19, 2002

## APPEARANCES OF COUNSEL

*John B. Grant, Jr.,* of counsel, New York City (*John F. Triggs* and *Glenn Burhans, Jr.,* on the brief; *Greenberg Traurig, LLP,* attorneys), for appellant.

*Edward L. Sadowsky* of counsel, New York City (*Stacy B. Krieger* on the brief; *Blank Rome Tenzer Greenblatt LLP,* attorneys), for respondent.

**OPINION OF THE COURT**

SAXE, J.

This appeal provides us with the opportunity to consider the enforceability of a rent abatement clause as liquidated damages in the context of a commercial lease. We conclude that the trial court's decision, invalidating the parties' agreed-upon rent abatement clause as an unenforceable penalty, constituted a misapplication of the law regarding liquidated damages provisions, and accordingly, we reverse.

Plaintiff Bates Advertising USA, Inc. (Bates) is a large advertising and marketing firm that provides services to international corporate clients, including Estee Lauder, Wendy's, and Avis Rent-A-Car. When the March 1999 expiration of its lease at the Chrysler Building began to approach, Bates started a search for new quarters for its New York City headquarters. It ultimately entered into negotiations to lease space in defendant's building, located at 498 Seventh Avenue, in the Garment District.

Both parties, highly sophisticated business entities, represented by accomplished and experienced real estate attorneys, understood that plaintiff would serve as the building's "anchor" or "flagship" tenant, with the hope of attracting other similar "image-conscious" corporate tenants to the building, thereby increasing the value of the building and surrounding area. The parties also understood that for this to occur, defendant landlord would have to make substantial improvements and renovations to both the inside and the outside of the building.

In consultation with engineers and architects, the parties agreed upon a list of alterations for the landlord to make, some relating to the building's structure or systems, some practical, others of an aesthetic nature. These alterations are listed in Exhibit C to the lease. While many of the agreed-upon changes had to be made before plaintiff could move into the premises, one portion of this list, part E of Exhibit C of the lease, specifies improvements and upgrades that the parties agreed the landlord could complete after plaintiff had moved in. These included such items as installing a new lobby at Seventh Avenue and redecorating the 36th Street lobby (item E-1), upgrading and reprogramming elevators (items E-2 through E-4), installing a card key access system for after hours access to the

building (item E-5), providing a base building Class E fire alarm and communication system (item E-7), providing condenser water towers for winter operation (item E-8), cleaning and repointing the building exterior (item E-9), and installing exterior lighting (item E-10).

Both parties understood that the contemplated alterations listed in this latter category were a vital part of the deal. They also understood that, as a practical matter, it would be difficult for the tenant to prove the value of its damages arising from a breach of this lease term. As the real estate attorney who negotiated the lease on behalf of plaintiff explained, there would be no way of knowing whether a loss of a client, or an employee, had been caused by conditions in the building. Therefore, although the tenant was willing to begin its tenancy before all the agreed-upon alterations had been completed, and the landlord was no less interested in the tenancy beginning, it was necessary for the parties to acknowledge and somehow provide for the possibility of delays attendant to these additional alterations.

This situation, of course, is not unique to these parties. Because, in general, it is in the mutual interests of potential tenants and developers or landlords to negotiate new tenancies and to permit new tenancies to begin even while some improvements have yet to be completed, a solution has been adopted by the real estate profession generally. As explained in the testimony of plaintiff's Director of Real Estate, the common practice, employed here, is to provide for rent abatements so that the tenant has an enforcement mechanism to ensure that construction items are timely completed (*and see*, Johnson, *Tenant Issues When Leasing Space in a To-Be-Constructed Office Building*, 12 Com Leasing L & Strategy 1 [Dec. 1999]).

Accordingly, in an attempt to have the tenancy begin as early as possible while ensuring that the landlord would be sufficiently motivated to follow through with these items after plaintiff took possession of its premises, the parties included article 54 (C) in the lease. It provides that

> "If Landlord does not substantially complete the work described in part E of Exhibit C by January 1, 1999 and Tenant has taken full occupancy of the initial demised premises and is conducting its ordinary business therein, then Tenant shall be entitled to a one-half (½) day delay in the occurrence of the Commencement Date for all portions of

the premises for each day from January 2, 1999 until Landlord substantially completes such work; provided, however, that if the work that Landlord so failed to complete is that described in items E-7 or E-8 of Exhibit C, then the one-half (½) day delay shall be changed to one (1) day."

Nothing in this rent abatement provision creates an unenforceable penalty or forfeiture, or violates the purpose of the rule regarding the viability of liquidated damages. That rule is clearly explained in *Truck Rent-A-Ctr. v Puritan Farms 2nd* (41 NY2d 420):

"Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract [citation omitted]. In effect, a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement [citation omitted]. Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy [citation omitted]. *Provisions for liquidated damages have value in those situations where it would be difficult, if not actually impossible, to calculate the amount of actual damage." (Id.* at 423-424 [emphasis added].)

Testimony established that this was a situation where it would be difficult, if not impossible, to calculate plaintiff's damages resulting from a breach, since there would be no way of knowing whether a loss of a client had been caused by conditions in the building. Yet, the trial court concluded that the rent abatement clause violated the rule that "[t]here must be some attempt to proportion * * * damages to the actual loss" (*see, Seidlitz v Auerbach*, 230 NY 167, 174), implicitly suggesting that the parties must address separately each possible breach and provide for a penalty, rent abatement or otherwise, proportionate to each possible breach. Such an interpretation of the rule regarding liquidated damages goes well beyond the protections the rule is intended to provide.

In *Seidlitz v Auerbach (supra)*, the liquidated damages provision was invalidated where the lease term at issue provided that the tenant would forfeit its entire security deposit, representing more than one year's rent, for *any* contractual

default, ranging from the failure to pay rent to the failure to pay a $17 insurance premium. Similarly, in *LeRoy v Sayers* (217 AD2d 63), the Court invalidated a lease term providing for forfeiture of the prospective tenant's $50,000 rent deposit plus a $13,500 security deposit on a summer house rental, without reference to whether the anticipatory breach occurred months before the "high rental season," when the landlord would likely suffer negligible damages, or days before the beginning of the lease term, when the landlord's damages would likely be substantially higher. However, it should be noted that the rule sets aside liquidated damages clauses only when "the amount fixed is plainly or grossly disproportionate to the probable loss" (*see, Truck Rent-A-Ctr., supra* at 425).

Here, the parties made every reasonable effort to provide for appropriate compensation in the event the landlord breached its obligation to bring the building up to the agreed-upon standard. They broke down the contemplated improvements into two categories: nine work items for which plaintiff would be entitled to a half-day rent abatement for each day any of them remained lacking, and two work items that were deemed of such importance that the landlord would be subject to a full-day rent abatement for each day these items were not provided. By imposing this one-to-one proportionality between the days the breach continued and the value of the compensation, the parties successfully avoided the possibility that the tenant would obtain a benefit in gross disproportion to the injury it suffered. Nor is such vast disproportion created by the fact that the full-day abatement would be applicable whether one or both of two possible improvements remained uncompleted.

As to the trial court's conclusion that disproportion is apparent where the half-day abatement is applied whether one item or all nine items were lacking, it takes the concept of proportionality to too great an extreme. To require that a liquidated damages amount be set for each individual work item with the type of specificity this ruling requires, would be contrary to the concept of liquidated damages. These are contemplated breaches that the parties are *unable* to quantify as money damages. It is unclear how the parties could arrive at a set degree of rent abatement for each item breached, without first quantifying that which they agree is unquantifiable.

Instead, in order to arrive at a reasonable accommodation, the parties set forth a group of work items, any or all of which would trigger the *maximum* of a half-day rent abatement for each day of delay. Considering not only that the disproportion

is minor, but that any disproportion is as likely to inure to the benefit of the landlord as to that of the tenant, such a provision is simply not a penalty "grossly disproportionate to the probable loss" as the term was used by the Court of Appeals (*see, Truck Rent-A-Ctr., supra* at 425; *Federal Realty Ltd. Partnership v Choices Women's Med. Ctr.*, 289 AD2d 439).

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered July 18, 2001, which dismissed plaintiff's causes of action based on the rent abatement clause of the parties' lease on the ground that the clause constitutes an unenforceable penalty, should be reversed, on the law, without costs, those causes of action reinstated and the matter remanded for further proceedings.

NARDELLI, J.P., ANDRIAS, ELLERIN and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered July 18, 2001, reversed, on the law, without costs, plaintiff's causes of action based on the rent abatement clause of the parties' lease reinstated and the matter remanded for further proceedings.